# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

KEVIN SEARS, #898757,

                Petitioner,

     v.

DUNCAN MACLAREN,

                Respondent.

Case No. 17-10304
Hon. Terrence G. Berg

## OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

## I.    Introduction

This is a petition for writ of habeas corpus brought pursuant to 28 U.S.C. § 2254. Michigan prisoner Kevin Sears ("Petitioner") was convicted of conspiracy to commit first-degree premeditated murder, MICH. COMP. LAWS §§ 750.157a, 750.316(a), and solicitation of murder, MICH. COMP. LAWS § 750.157b(2), following a jury trial in the Macomb County Circuit Court. He was sentenced to concurrent terms of life imprisonment and 12 to 23 years imprisonment in 2014. In his *pro se* petition, he raises claims concerning the trial court's reference to jurors by their numbers instead of names and the trial court's exclusion of a witness's prior inconsistent statement. For the reasons set forth, the Court denies the petition for a

writ of habeas corpus. The Court also denies a certificate of appeal-ability and denies Petitioner leave to proceed *in forma pauperis* on appeal.

## II. Facts and Procedural History

Petitioner's convictions arise from his participation in a plot to kill his estranged wife before their divorce became final. The Court adopts the following summary of the trial testimony, provided by the prosecutor on direct appeal, to the extent that it is consistent with the record:

> In October of 2010, Mallorie Wilson-Strat ("Wilson-Strat") met Kevin Sears ("Sears"). (Tr. 12-4-13, 140). Wilson-Strat met Sears through the involvement of one of her friends and Sears' sister, Christina Sears ("Christina"). (Tr. 12-4-13, 142–143). At that time, Sears was married to Jessica Sears ("Jessica"), with whom he had three children. (Tr. 12-4-13, 89–92). Wilson-Strat and Sears, who was in the process of divorcing Jessica, began a romantic relationship. (Tr. 12-4-13, 89–92, 143–145).
>
> In late December of 2010 or early January of 2011, Wilson-Strat, through separate conversations with Sears and Christina, learned that Sears and Christina "wanted to have Jessica killed." (Tr. 12-4-13, 147). During this period, Sears told Wilson-Strat at the Comfort Suites in Warren where Christina worked that he was going to kill Jessica himself. (Tr. 12-4-13, 147–148). Ultimately, Sears asked Wilson-Strat to help him kill Jessica. (Tr. 12-5-13, 73). Soon thereafter, Christina asked Wilson-Strat during a telephone conversation if Wilson-Strat knew "anyone" who could kill Jessica. (Tr. 12-4-13, 148–149). Wilson-Strat believed that Christina was "serious." (Tr. 12-4-13, 149).

Wilson-Strat contacted her friend, April Evelyn ("April"). (Tr. 12-4-13, 149). She asked April if April "knew anybody that could take care of somebody." (Tr. 12-4-13, 149). April asked Wilson-Strat what Wilson-Strat meant "by take care of" somebody. (Tr. 12-4-13, 149). Wilson-Strat clarified that she meant "to kill somebody." (Tr. 12-4-13, 149). April asked her boyfriend, David Clark ("Clark"), and Clark stated that "he could do it." (Tr. 12-4-13, 149–150). At one point, Wilson-Strat spoke to Clark directly. (Tr. 12-4-13,150). Clark asked how much "they were willing to pay." (Tr. 12-4-13, 150).

Wilson-Strat had various subsequent face-to-face discussions with Sears, Christina, Clark, and Clark's friend, Jordan Powell ("Powell"). (Tr. 12-4-13, 150–153). Although Sears and Wilson-Strat communicated extensively by text message during their relationship, they did not send text messages regarding the murder conspiracy. (Tr. 12-4-13,151–152). Sears told Wilson-Strat "[t]o not text about it because if, in fact, Jessica did end up dead, [Sears] would be the first person that they looked at." (Tr. 12-4-13, 152).

Christina wanted to meet Clark. (Tr. 12-4-13, 153–154). Wilson-Strat, Christina, and Clark met at the Comfort Suites in Warren where Christina was working. (Tr. 12-4-13, 155). Later that day, Wilson-Strat drove Clark out to the Sears' residence in Armada Township "[s]o he could see the surroundings of their house." (Tr. 12-4-13, 155).

On a subsequent day, Wilson-Strat and Clark met with Powell at April's house regarding the plot "to murder Jessica Sears." (Tr. 12-4-13, 155–158). Clark and Powell "decided to take knives with them." (Tr. 12-4-13, 156). Neither Clark nor Powell had a vehicle so Wilson-Strat "was going to drive them." (Tr. 12-4-13, 156–157). Clark

"wanted some money up-front" and "then when he completed the job he was going to get the rest on the back-end." (Tr. 12-4-13, 158). Wilson-Strat had heard Sears and Christina talk about the fact that Sears was beneficiary on an insurance policy on Jessica's life. (Tr. 12-4-13, 158-159). Sears gave Wilson-Strat $1,000.00 "to give to [Clark] for his front-end payment." (Tr. 12-4-13, 159–160).

A few weeks later, on the evening of March 23, 2011, Wilson-Strat drove Clark and Powell to the Sears' house. (Tr. 12-4-13, 158, 160). Wilson-Strat knew that Jessica would be staying at the Sears' house that night because of the family's parenting time arrangement. (Tr. 12-4-13, 161–162). Clark and Powell were carrying knives. (Tr. 12-4-13, 161). Kevin had informed Wilson-Strat that "there was a window open in the basement." (Tr. 12-4-13, 161). Wilson-Strat told Clark and Powell "to check all the windows on the basement level so that it didn't appear that they knew which window was the one that was open." (Tr. 12-4-13, 161). Wilson-Strat told them to do this so that the crime would appear like "a regular break-in." (Tr. 12-4-13, 161). She advised them "where [Jessica's] bedroom was" located. (Tr. 12-4-13, 161). Wilson-Strat "let [Clark and Powell] out of the car, they got out and [she] drove up and down the street waiting from them to come out." (Tr. 12-4-13, 161).

Clark and Powell ultimately returned to Wilson-Strat's vehicle and climbed inside carrying Jessica's purse. (Tr. 12-4-13, 162). Wilson-Strat "wanted them to return the purse." (Tr. 12-4-13, 162–163). They refused to do so. (Tr. 12-4-13, 163). Clark and Powell told Wilson-Strat that "they couldn't get the bedroom door open" because the knob "just kept turning." (Tr. 12-4-13, 163). Wilson-Strat drove both Clark and Powell to their homes. (Tr. 12-4-13, 164).

In March of 2011, Jessica resided on Capac Road in Armada Township in the area of 34 Mile Road and Romeo Plank. (Tr. 12-4-13, 90–91). As indicated, she was in the middle of a divorce from Sears. (Tr. 12-4-13, 91). As part of a nesting arrangement, Jessica lived during the week in the house with her three young children and Sears lived with the children in the house during the weekend. (Tr. 12-4-13, 92). On the morning of March 23, 2011, Jessica awoke to discover that her "purse was missing." (Tr. 12-4-13, 93). She kept her purse hanging on the banister to the stairs that go down into her basement. (Tr. 12-4-13, 102). There was snow outside and she noticed that there were "footprints going around [her] house." (Tr. 12-4-13, 93–94). Jessica called the police. (Tr. 12-4-13, 94).

That day, Michigan State Police ("MSP") Trooper Jeffrey Juneac ("Trooper Juneac") was on road patrol when he was dispatched to the reported break-in at Jessica's house in northern Macomb County. (Tr. 12-4-13, 65–67). Arriving at the house on Capac Road, Trooper Juneac interviewed Jessica, who reported a purse missing from inside the house. (Tr. 12-4-13, 67, 76).

Trooper Juneac viewed "[two sets of] foot impressions in the snow . . . going around her residence to a window on the . . . back side of her home where the foot impressions went up to a window." (Tr. 12-4-13, 67–68, 71–73). Trooper Juneac saw the screen from a basement window on the ground. (Tr. 12-4-13, 72–73). The basement window appeared to Trooper Juneac to be the "entry point" for the break-in. (Tr. 12-4-13, 68, 71–72). The two sets of footprints in the snow led up to the suspected entry point to the house and continued back away from the residence. (Tr. 12-4-13, 72–74).

Jessica told Trooper Juneac that she had been home the previous evening and that her purse was missing from a

stairway inside the house. (Tr. 12-4-13, 67-68, 76). Trooper Juneac took photographs of the exterior of the house. (Tr. 12-4-13, 68–75).

This same day, Wilson-Strat advised both Sears and Christina that this attempt on Jessica's life had been unsuccessful. (Tr. 12-4-13, 164). Sears was upset because "Jessica called the police because someone was in their house." (Tr. 12-4-13, 165). He was mad because "the police now were involved" and "alarms were going to be put in their house." (Tr. 12-4-13, 165).

Subsequently, Wilson-Strat "asked another friend of [hers] if he knew anybody that could murder someone." (Tr. 12-4-13, 165–166). Wilson-Strat's friend provided her with John Walker's name and telephone number. (Tr. 12-4-13, 165–166; Tr. 12-6-13, 13-14). John Walker turned out to be Macomb County Sheriff's Office Sergeant John Glass ("Sergeant Glass"), who was working undercover for the County of Macomb Enforcement Team ("COMET"). (Tr. 12-4-13, 166, 172; Tr. 12-6-13, 12–14).

Exchanging text messages, Wilson-Strat and Sergeant Glass set up a face-to-face meeting for April 7, 2011, outside the Farm Fresh Market in Oak Park were Wilson-Strat was employed. (Tr. 12-4-13, 172; Tr. 12-6-13, 14–15, 18). Sergeant Glass told Wilson-Strat that he "could do it as long as [they] were sure that that's what [they] wanted." (Tr. 12-4-13, 172–173). Wilson-Strat told Sergeant Glass that they were "serious" about it. (Tr. 12-4-13, 173). Wilson-Strat informed Sergeant Glass that Jessica was the target of the murder plot and gave him her address. (Tr. 12-4-13, 173–174; Tr. 12-6-13, 16).

At the meeting, Wilson-Strat advised Sergeant Glass, who wore an audio wire, she and Sears wanted Jessica

murdered because Jessica was abusing the Sears' children. (Tr. 12-4-13, 174; Tr. 12-6-13, 19–30). Sears and Christina had both told Wilson-Strat "that there was abuse done to the children" and that Jessica was perpetrating this abuse. (Tr. 12-4-13, 175). Sears had showed Wilson-Strat photographs of his daughter with marks on her arm and stated that Jessica had inflicted these injuries with a curling iron. (Tr. 12-4-13, 176). Wilson-Strat had asked if Sears had called Children's Protective Services ("CPS"). (Tr. 12-4-13, 176–177). Sears claimed that CPS wasn't "going to help." (Tr. 12-4-13, 177).

Wilson-Strat and Sergeant Glass met for approximately 15 minutes inside Sergeant Glass' vehicle. (Tr. 12-4-13, 176). Wilson-Strat and Sergeant Glass discussed the prior attempt on Jessica's life. (Tr. 12-4-13, 32–33). Wilson-Strat told Sergeant Glass that they "needed it to be done before April 18th" because the Sears' divorce would be final by that date. (Tr. 12-6-13, 30–31). As it turned out, Sears and Jessica were divorced on April 18, 2011. (Tr. 12-6-13, 32).

Soon after this conversation, Wilson-Strat met with Christina at Christina's request to discuss Sergeant Glass. (Tr. 12-4-13, 177, 181). Sears wanted "as much . . . out of the details as possible" because "he was going to be the first person that they looked at if, in fact, Jessica was murdered." (Tr. 12-4-13, 178). Christina asked Wilson-Strat if she could meet Sergeant Glass. (Tr. 12-4-13, 181). By this time, Sergeant Glass' attempts to investigate the prior attempt on Jessica's life led him to the discovery of "a report from the Michigan State [Police] about a break-in at Jessica Sears house." (Tr. 12-6-13, 34).

Christina ultimately met with Sergeant Glass on Friday, April 8, 2011, who was again wearing an audio wire, at the Comfort Suites in Warren. (Tr. 12-4-13, 182;

Tr. 12-6-13, 34–36). Sergeant Glass spoke with Christina and boyfriend, Bashar Mansour, in the hotel lobby. (Tr. 12-6-13, 35–36). To Sergeant Glass, Christina "wanted to see if [he] was for real or not." (Tr. 12-6-13, 36–42). She indicated that Sears "felt he was getting the short end of the stick in the divorce, wasn't' going to get the house and Jessica would get custody of the kids." (Tr. 12-6-13, 42). Christina was "gleeful" during the conversation, stating at the end of the meeting: "I'm so excited." (Tr. 12-6-13, 41).

After this meeting, Wilson-Strat spoke with Christina. (Tr. 12-4-13, 182). Christina said that Sergeant Glass "seemed like he could be a cop." (Tr. 12-4-13, 182). Wilson-Strat asked: "[D]o you want to go with this guy or [Clark and Powell]?" (Tr. 12-4-13, 182). Christina replied: "[W]e can go with [Sergeant Glass]." (Tr. 12-4-13, 182).

Later, at trial, the assistant prosecuting attorney introduced Wilson-Strat's cellular telephone records into evidence, including her text messages from late 2010 and early 2011 with Sears and Christina. (Tr. 12-4-13, 189–228; Tr. 12-5-13, 16–20). Wilson-Strat told the jury that she and Sears employed code words like "computer" and "party" instead of explicit words like "kill" or "murder" in their text messages. (Tr. 12-4-13, 202; Tr. 12-5-13, 19–20). For example, on March 6, 2011, Sears text-messaged Wilson-Strat: "It's okay, I miss you, I loved cuddling with you last night, hope we can do it again soon, any word on that computer." (Tr. 12-5-13, 20). Wilson-Strat testified at trial that she interpreted this text message to mean: "Any word on, if these people were going to kill her." (Tr. 12-5-13, 21). Wilson-Strat later replied: "I need you to keep going, I look forward to your texts, to your calls, to you coming to see me, me coming to see you, you holding me, holding you, Kevin, I need you for." (Tr. 12-5-13, 22). Sears answered: "So that's a no, then,

right." (Tr. 12-5-13, 22). Referring to Clark and Powell, she retorted: "Haven't talked to them, I'm pissed, haven't heard from them, will let me know today." (Tr. 12-5-13, 22).

On March 7, 2011, Sears and Wilson-Strat exchanged text messages regarding Clark's acceptance of the $1,000.00 and the fact that Clark not "go[ing] through with the death of Jessica." (Tr. 12-5-13, 52–54). On one occasion during this period, Wilson-Strat and Sears were text-messaging about marriage. (Tr. 12-4-13, 199–200). Sears text-messaged Wilson-Strat: "You do your job and I'll marry you." (Tr. 12-4-13, 199–200). At trial, Wilson-Strat testified that she understand [sic] what Sears meant in that text message because Sears "had asked [her] to do one thing." (Tr. 12-4-13, 200, 202). On another occasion, Sears text-messaged Wilson-Strat: "When are we doing this?" (Tr. 12-4-13, 218). She replied: "It will be fixed this next weekend." (Tr. 12-4-13, 220). Wilson-Strat told the jury that "fixed" meant the "death of Jessica." (Tr. 12-4-13, 220). At another point, Sears text-messaged Wilson-Strat: "No more fucking waiting." (Tr. 12-4-13, 224). Wilson-Strat responded: "Please don't cuss at me, and the guy went to jail, I have one more guy, just got to talk to him, please give me a little more time." (Tr. 12-4-13, 224).

Later, Sears text-messaged her: "Everyone had their chance, nor I'll get my turn." (Tr. 12-4-13, 225). Wilson-Strat answered: "No, Kevin, please." (Tr. 12-4-13, 225). Wilson-Strat "didn't want [Sears] to kill [Jessica] . . . [b]ecause he would go away for the rest of his life." (Tr. 12-4-13, 225). She text-messaged Sears: "You will go away for life." (Tr. 12-4-13, 226). He subsequently text-messaged Wilson-Strat: ". . . I don't want to hear another word."(Tr. 12-4-13, 227). Still, Sears later text-messaged Wilson-Strat: "You doing it." (Tr. 12-4-13, 228). She replied: "Of course I am, babe." (Tr. 12-4-13, 228). Wilson-

Strat testified that she meant to inform Sears that she was "still trying to have Jessica killed." (Tr. 12-4-13, 228).

On April 9, 2011, Sears text-messaged Wilson-Strat: "We need to talk when you get here." (Tr. 12-5-13, 57). She replied: "Good or bad." (Tr. 12-5-13, 57). He responded: "Not good." (Tr. 12-5-13, 57). Wilson-Strat text-messaged: "What is it." (Tr. 12-5-13, 57). Sears answered: "You know what it is." (Tr. 12-5-13, 58). She text-messaged: Almost there, but I got it covered. I told you yesterday. You don't want me to tell you, though." (Tr. 12-5-13, 58). Wilson-Strat testified that she meant that she had found Sergeant Glass to kill Jessica. (Tr. 12-5-13, 58).

In February and March of 2011, Wilson-Strat and Christina also exchanged numerous text messages regarding the plan to kill Jessica. (Tr. 12-5-13, 26–50). Wilson-Strat told the jury at trial that Sears "pressured" her and Christina during these months "[t]o have his wife murdered." (Tr. 12-5-13, 34).

After Sergeant Glass' face-to-face meeting with Christina, he continued to exchange text messages with Wilson-Strat. (Tr. 12-6-13, 42). Sergeant Glass sarcastically texted her: "Can you possibly get anymore people involved in this?" (Tr. 12-6-13, 42). She replied: "Don't worry about it, we don't snitch." (Tr. 12-6-13, 43). Soon, Sergeant Glass received a text message from Wilson-Strat: "Chrissy says it's a go." (Tr. 12-6-13, 43). Later that day, she text-messaged Sergeant Glass, indicating to him that one of Sears' children had "drank carpet cleaner" while in Jessica's care. (Tr. 12-6-13, 42–43). Ultimately, Wilson-Strat sent him a text message stating that they could meet the following Monday and "they could give [him] a present." (Tr. 12-6-13, 44).

Subsequently, on April 11, 2011, Wilson-Strat and Christina met face-to-face with Sergeant Glass at the Comfort Suites in Warren. (Tr. 12-4-13, 182; Tr. 12-6-13, 45). COMET had "arrest teams in place." (Tr. 12-6-13, 45). Wilson-Strat handed Sergeant Glass, who was again wearing an audio wire, $500.00. (Tr. 12-4-13, 183; Tr. 12-6-13, 45, 47). Sears contributed $100.00 and Christina contributed $400.00. (Tr. 12-4-13, 183). Sears gave this cash to Wilson-Strat on the previous night. (Tr. 12-4-13, 183). During the meeting, Wilson-Strat telephoned Sears and spoke to him. (Tr. 12-4-13, 184). Sergeant Glass asked Wilson-Strat to telephone Sears because Sergeant Glass "wanted to make sure [Sears] was serious about his wife being murdered" and that Sears "wasn't being set up." (Tr.12-4-13, 185; Tr. 12-6-13, 46). Sears told Wilson-Strat to [tell] Sergeant Glass to "call after the Piston's game that [he and Wilson-Strat] were going to that night, so that [he and Sergeant Glass] could have a conversation." (Tr. 12-4-13,184; Tr. 12-6-13, 49). Sergeant Glass "was supposed to call [Wilson-Strat's] phone." (Tr. 12-4-13, 184). Near the end of the meeting, Wilson-Strat told Sergeant Glass: "[Sears] asked if [you] could make Jessica suffer." (Tr. 12-6-13, 48). Sergeant Glass replied: "So you're okay with a little bit of torture." (Tr. 12-6-13, 48). Wilson-Strat responded affirmatively. (Tr. 12-6-13, 48).

As the meeting concluded, Sergeant Glass "gave the signal for the arrest teams to come" into the hotel. (Tr. 12-6-13, 65). When the arrest teams did not enter the hotel, Sergeant Glass walked outside the hotel, which was "the back-up signal for the arrest teams to come in." (Tr. 12-6-13, 66). At this point, the COMET officers entered the hotel and arrested Wilson-Strat and Christina. (Tr. 12-6-13, 66–67).

Pet. App. Brf., pp. 1–12.

Following his convictions and sentencing, Petitioner filed an appeal of right with the Michigan Court of Appeals raising several claims, including those raised in his habeas petition. The court denied relief on those claims and affirmed his convictions. *People v. Sears*, No. 320458, 2015 WL 3757613, *1–4. Petitioner then filed an application for leave to appeal with the Michigan Supreme Court, which was denied in a standard order. *People v. Sears*, 499 Mich. 856, 873 N.W.2d 318 (2016). Petitioner subsequently challenged his judgment of sentence on state collateral review, but was denied relief. Those proceedings are not germane to this habeas action.

Petitioner thereafter filed his federal habeas petition. He raises the following claims:

I.   The trial court violated his due process rights by empaneling a jury referred to only by juror numbers and by failing to give a proper cautionary instruction.

II.  He was denied his constitutional right to present a defense, to confront witnesses against him, and to a fair trial when the trial court refused to allow impeachment of Mallorie Wilson-Strat with extrinsic evidence of a prior inconsistent statement that she made to Latoyia Brooks.

Respondent has filed an answer to the petition contending that it should be denied because the first claim is barred by procedural default and both claims lack merit.

## III. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 *et seq.*, sets forth the standard of review that federal courts must use when considering habeas petitions brought by prisoners challenging their state court convictions. The AEDPA provides in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court

and nevertheless arrives at a result different from [that] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002).

"[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520–21 (citations omitted); *see also Williams*, 529 U.S. at 409. "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh*, 521 U.S. at 333, n. 7; *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).

The United States Supreme Court has held that "a state court's determination that a claim lacks merit precludes federal ha-

beas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003)).  A habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.*  Thus, in order to obtain federal habeas relief, a state prisoner must show that the state court's rejection of a claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*; *see also White v. Woodall*, 572 U.S. 415, 419 (2014). Federal judges "are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). A habeas petitioner cannot prevail as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable.  *Woods v. Etherton*, 136 S. Ct. 1149, 1152 (2016).

Section 2254(d)(1) limits a federal court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *Williams*, 529 U.S. at 412; *see also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 125–26 (2008) (per curiam)); *Lockyer*, 538 U.S. at 71–72. Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 562 U.S. at 100. Furthermore, it "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16.

The requirements of "clearly established law" are to be determined solely by Supreme Court precedent. Thus, federal circuit or district court cases do not constitute clearly established Supreme Court law and cannot provide the basis for federal habeas relief. *See Parker v. Matthews*, 567 U.S. 37, 48 (2012) (per curiam); *see also*

*Lopez v. Smith*, 135 S. Ct. 1, 2 (2014) (per curiam). The decisions of lower federal courts, however, may be useful in assessing the reasonableness of a state court's decision. *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002).

Lastly, a state court's factual determinations are presumed correct on federal habeas review. 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360–61 (6th Cir. 1998). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## IV. Discussion

### A. Use of Juror Numbers

Petitioner first asserts that he is entitled to habeas relief because the trial court referred to jurors by their numbers instead of their names and did not give a proper cautionary instruction. Respondent contends that this claim is barred by procedural default and that it lacks merit.

Federal habeas relief may be precluded on a claim that a petitioner has not presented to the state courts in accordance with the state's procedural rules. *Wainwright v. Sykes*, 433 U.S. 72, 85–87 (1977); *Couch v. Jabe*, 951 F.2d 94, 96 (6th Cir. 1991). The doctrine

of procedural default applies when a petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "adequate and independent." *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2006); *Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005); *Coleman v. Mitchell*, 244 F.3d 533, 539 (6th Cir. 2001). "A procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263–64 (1989). The last explained state court ruling is used to make this determination. *Ylst v. Nunnemaker*, 501 U.S. 797, 803–05 (1991).

The Michigan Court of Appeals rendered the last reasoned opinion on this claim. In denying relief, the court relied upon a state procedural bar – Petitioner's failure to object at trial. *Sears*, 2015 WL 3757613 at *2. The failure to make a contemporaneous objection is a recognized and firmly-established independent and adequate state law ground for refusing to review trial errors. *People v. Carines*, 460 Mich. 750, 763, 597 N.W.2d 130, 138 (1999); *People v. Stanaway*, 446 Mich. 643, 687, 521 N.W.2d 557, 579 (1994); *see also Coleman v. Thompson*, 501 U.S. 722, 750–51 (1991). Moreover, a state court does not waive a procedural default by looking beyond

the default to determine if there are circumstances warranting review on the merits. *Paprocki v. Foltz*, 869 F.2d 281, 285 (6th Cir. 1989). Plain error review does not constitute a waiver of state procedural default rules. *Girts v. Yanai*, 501 F.3d 743, 755 (6th Cir. 2007); *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000). Nor does a state court fail to sufficiently rely upon a procedural default by ruling on the merits in the alternative. *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991). The Michigan Court of Appeals denied relief on this claim based a procedural default – Petitioner's failure to object at trial.

A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 753; *Gravley v. Mills*, 87 F.3d 779, 784–85 (6th Cir. 1996). To establish cause, a petitioner must establish that some external impediment frustrated the ability to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A petitioner must present a substantial reason to excuse the default. *Amadeo v. Zant*, 486 U.S. 214, 223 (1988). Such reasons include interference by officials, attorney error rising to the level of ineffective assistance of counsel, or a showing

that the factual or legal basis for a claim was not reasonably available. *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991).

Petitioner neither alleges nor establishes cause to excuse this default. A federal habeas court need not address the issue of prejudice when a petitioner fails to establish cause to excuse a procedural default. *Smith v. Murray*, 477 U.S. 527, 533 (1986); *Long v. McKeen*, 722 F.2d 286, 289 (6th Cir. 1983). Nonetheless, the Court notes that Petitioner cannot establish prejudice (or that he is otherwise entitled to habeas relief on the merits of this claim) because, as explained by the Michigan Court of Appeals in reviewing the claim for plain error, the claim also lacks merit. *See Sears*, 2015 WL 3757613 at *2.

Although the United States Court of Appeals for the Sixth Circuit has held that the empaneling of an anonymous jury should be limited to circumstances in which the jury needs reasonable protections, and then only after taking care to minimize any prejudicial effect on the defendant, *United States v. Talley*, 164 F.3d 989, 1001 (6th Cir. 1999) (citing cases), neither due process nor the Sixth Amendment require that a juror's identity be disclosed. *See United States v. Lawson*, 535 F.3d 434, 440–41 (6th Cir. 2008) (rejecting the notion that the Constitution establishes a right to juror identification). The Supreme Court has never held that jurors must be referred to by their names, rather than by their juror numbers. *See*

*Cook v. Haas*, No. 5:13-CV-12171, 2014 WL 256286, *3 (E.D. Mich. Jan. 23, 2014) (citing *Lawson*, 535 F.3d at 440, and denying habeas relief on similar claim). Consequently, Petitioner cannot show that the state court's denial of relief is contrary to or an unreasonable application of clearly established Supreme Court precedent. *See Wright v. Van Patten*, 552, U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented..., it cannot be said that the state court unreasonably applied clearly established Federal law.") (internal quotations and citations omitted).

Moreover, as explained by the Michigan Court of Appeals, the jurors were not anonymous to the parties. The parties had access to the juror questionnaires and had the opportunity to ask the jurors questions about their backgrounds, attitudes, and potential biases. The trial court's use of juror numbers did not render the jury 'anonymous' nor otherwise preclude the parties from conducting an adequate jury voir dire.

Petitioner relatedly asserts that the trial court erred by failing to give a cautionary jury instruction that referring to the jurors by number was a uniform practice and not a reflection of his guilt or dangerousness. In order for habeas relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous or universally condemned. Rather, taken as a whole, they must be so infirm that

they rendered the entire trial fundamentally unfair. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). A jury instruction is not to be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *Jones v. United States*, 527 U.S. 373, 391 (1999); *Grant v. Rivers*, 920 F. Supp. 769, 784 (E.D. Mich. 1996). The failure to give an instruction that is supported by the evidence does not automatically justify habeas relief – the failure to instruct must have rendered the trial fundamentally unfair. *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Daniels v. Lafler*, 501 F.3d 735, 741 (6th Cir. 2007). "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson*, 431 U.S. at 155. State law instructional errors rarely form the basis for federal habeas relief. *Estelle*, 502 U.S. at 71–72.

There is no clearly established Supreme Court precedent requiring such a cautionary instruction – and the "decision to empanel an anonymous jury 'is within the sound discretion of the trial court,'" *Lawson*, 535 F.3d at 439 (quoting *United States v. Talley*, 164 F.3d 989, 1001 (6th Cir. 1999)). There is no indication in the record that the jurors in this case would have believed that the trial court had prejudged the case or found Petitioner to be dangerous based upon the jury voir dire method. *See, e.g., Johnson v. Smith*, No. 15-CV-10574, 2017 WL 3007065, *12 (E.D. Mich. July 14, 2017) (denying

habeas relief on similar claim). To be sure, the trial court instructed the jury that Petitioner was presumed innocent and that their decision should be based upon the evidence presented at trial. Jurors are presumed to follow the court's instructions. *See Penry v. Johnson*, 532 U.S. 782, 799 (2001) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)); *United States v. Powell*, 469 U.S. 57, 66 (1984) ("Jurors ... take an oath to follow the law as charged, and they are expected to follow it."). The lack of a specific cautionary instruction on the court's jury voir dire method did not render the trial fundamentally unfair. Petitioner fails to establish a constitutional violation. This claim lacks merit.

Petitioner also fails to establish that a fundamental miscarriage of justice occurred. The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 326–27 (1995). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 624 (1998). "To be credible, [a claim of actual innocence] requires a petitioner to support his [or her] allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup*, 513 U.S. at 324. Petitioner makes no such showing. This claim is thus

barred by procedural default, otherwise lacks merit, and does not warrant habeas relief.

## B.    Exclusion of Prior Inconsistent Statement

Petitioner also asserts that he is entitled to habeas relief because the trial court violated his rights to due process, to present a defense, and to confront the witnesses against him by refusing to allow defense counsel to cross-examine a witness with a prior inconsistent statement. Respondent contends that this claim lacks merit. The Michigan Court of Appeals described the facts underlying this claim as follows:

> At trial, defendant's trial counsel questioned Wilson–Strat regarding Latoyia Brooks, who was a fellow inmate and food-service coworker of Wilson–Strat. Defendant asked Wilson–Strat if she had discussed the case with Brooks, and Wilson–Strat replied, "Not that I recall." Outside the presence of the jury, defense counsel elicited testimony from Brooks that while in the prison shower together, Wilson–Strat told Brooks that she had tried to have her boyfriend's wife murdered. Brooks further testified that Wilson–Strat said she was going to testify against defendant because "she was trying to take him down with her because he didn't love her like she loved him." The trial court excluded Brooks' testimony from trial. On appeal, defendant asserts that the trial court should have permitted defendant to impeach Wilson–Strat with Brooks' testimony.

*Sears*, 2015 WL 3757613 at *3.

A federal court may only grant habeas relief to a person who is "in custody in violation of the Constitution or laws or treaties of the

United States." 28 U.S.C. § 2254(a). Alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). An error in state procedure or evidentiary law does not rise to the level of federal constitutional claims warranting habeas relief, "unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (quoting *Estelle*, 502 U.S. at 69-70); *see also Wynne v. Renico*, 606 F.3d 867, 871 (6th Cir. 2010) (citing *Bey v. Bagley*, 500 F.3d 514, 519-20 (6th Cir. 2007)); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

The right of an accused to present a defense has long been recognized as a "fundamental element of due process." *Washington v. Texas*, 388 U.S. 14, 19 (1967); *see also Holmes v. South Carolina*, 547 U.S. 319, 329-31 (2006); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). A defendant's right to present a defense is not unlimited, however, and may be subject to "reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). For example, a defendant "does not have an unfettered right to offer evidence that

is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)); *see also Holmes*, 547 U.S. at 326 (recognizing that "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury"). State rules excluding evidence from criminal trials "do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Scheffer*, 523 U.S. at 308 (internal citations omitted). "A defendant's interest in presenting . . . evidence may thus bow to accommodate other legitimate interests in the criminal trial process." *Id*. In such cases, the question is not whether the jury would reach a different result, but whether the defendant was afforded "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)); *see also Chambers*, 410 U.S. at 302.

The Confrontation Clause guarantees a criminal defendant the right to confront the witnesses against him or her. *Davis v. Alaska*, 415 U.S. 308, 315 (1973). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a

trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness's story to test the witness's perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i.e.*, discredit the witness." *Id.* at 314. The right of cross-examination, however, is not absolute. Trial judges "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. VanArsdall*, 475 U.S. 673, 679 (1986); *see also Jordan v. Warden, Lebanon Corr. Inst.*, 675 F.3d 586, 594 (6th Cir. 2012). As the United States Court of Appeals for the Sixth Circuit has explained:

> 'The key issue is whether the jury had enough information to assess the defense's theory of the case despite the limits on cross-examination.' *United States v. Holden*, 557 F.3d 698, 704 (6th Cir. 2009). 'So long as cross-examination elicits adequate information to allow a jury to assess a witness's credibility, motives, or possible bias, the Sixth Amendment is not compromised by a limitation on cross-examination.' *United States v. Cueto*, 151 F.3d 620, 638 (7th Cir. 1998); *accord United States v. Fields*, 763 F.3d 443, 464 (6th Cir. 2014).

*United States v. Callahan*, 801 F.3d 606, 624 (6th Cir. 2015).

The Michigan Court of Appeals denied relief on this claim, explaining in relevant part:

> Defendant next argues that the trial court erred when it refused to allow defendant to impeach Wilson–Strat with evidence of a prior inconsistent statement. Defendant claims this violated his constitutional right to present a defense, confront the witnesses against him, and a fair trial. We disagree.
>
> * * *
>
> Any party may attack the credibility of a witness. MRE 607. MRE 613 provides that, under certain circumstances, a witness may be examined regarding a prior inconsistent statement for impeachment purposes:
>
> (a) Examining witness concerning prior statement. In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request it shall be shown or disclosed to opposing counsel and the witness.
>
> (b) Extrinsic evidence of prior inconsistent statement of witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party opponent as defined in Rule 801(d)(2).
>
> Pursuant to MRE 613, to impeach a witness a party must first lay a proper foundation "by questioning the witness concerning the time and place of the statement and the person to whom it was allegedly made." *People*

*v. Rodriguez*, 251 Mich. App. 10, 34–35; 650 NW2d 96 (2002).

Defendant did not lay the proper foundation for the admission of the Wilson–Strat's alleged inconsistent statement. As the trial court found, defense counsel did not directly ask Wilson–Strat whether she ever told Brooks her motivation for testifying. Rather, defense counsel only generally asked whether Wilson–Strat told Brooks about her "situation." Defense counsel was also misleading about the timing of the alleged statement—asking Wilson–Strat if she talked to Brooks during a break when they were working in a food line, but then eliciting testimony from Brooks about a statement made while they were in the prison showers. Because Wilson–Strat did not have an opportunity to admit, deny, or explain her alleged statement to Brooks, it was not outside the range of principled outcomes to exclude the statement. *Duenaz*, 306 Mich. App. at 90.

Defendant argues that the trial court could have allowed defense counsel to question Brooks about Wilson–Strat's statement and later recall Wilson–Strat to give her the opportunity to admit, deny, or explain it. Defendant is correct that MRE 613(b) contains no particular sequence or timing required for the foundational order. *People v. Parker*, 230 Mich. App. 677, 683; 584 N.W.2d 753 (1998). But this Court has explained that "the traditional method of confronting a witness with his inconsistent statement prior to its introduction into evidence [is] the preferred method of proceeding," and it prevents a prior statement from being "incorrectly interpreted by a jury as substantive evidence." *Id.* (citation omitted). In *Parker*, this Court concluded that where the defendant knew about the declarant's prior inconsistent statement before the witness testified, it was not an abuse of discretion for the trial court to rule that the traditional se-

quence be followed. *Id.* at 683–684. Here, defense coun-
sel never requested an opportunity to recall Wilson–
Strat to establish a proper foundation after Brooks tes-
tified about the alleged prior statement. But even if de-
fense counsel had made such a request, the trial court
would not have erred by ruling that the traditional
method should be followed to prevent any misunder-
standing about the purpose of the evidence—for im-
peachment, not substance. *See id.*

*Sears*, 2015 WL 3757613 at *2–4.

The state court's denial of relief is neither contrary to Supreme
Court precedent nor an unreasonable application of federal law or
the facts. First, to the extent that Petitioner asserts that the trial
court erred in excluding the testimony under Michigan law, he
merely alleges a violation of state law which does not justify federal
habeas relief. State courts are the final arbiters of state law and
federal courts will not intervene in such matters. *Lewis v. Jeffers*,
497 U.S. 764, 780 (1990); *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir.
1987); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Sanford
v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002). Habeas relief does not
lie for perceived errors of state law. *Estelle*, 502 U.S. at 67–68.

Second, with regard to federal law, the exclusion of the evidence
did not render Petitioner's trial fundamentally unfair, impede his
right to present a defense, nor violate his right to confront the wit-
nesses against him. The trial court excluded the prior inconsistent
statement testimony as hearsay and found that defense counsel

failed to lay a proper foundation for its admission into evidence (as a prior inconsistent statement). This was a reasonable exercise of the state court's discretion in implementing the Michigan Rules of Evidence and did not render the trial fundamentally unfair. Moreover, while the trial court's evidentiary ruling foreclosed one avenue for impeachment of Wilson-Strat, Petitioner nevertheless mounted a meaningful defense and effectively confronted Wilson-Strat at trial. The record reflects that defense counsel challenged Wilson-Strat's version of events and her credibility during an extensive cross-examination, *see* 12/5/13 Trial Tr., pp. 74–167, 12/12/13 Trial Tr. pp. 88–154, presented several defense witnesses, *see* 12/6/13 Trial Tr., pp. 177–240, 12/12/13 Trial Tr., pp. 22–87, and argued during closing arguments that Wilson-Strat was not worthy of belief and that Petitioner was innocent of the charges. *See* 12/13/13 Trial Tr., pp. 41, 53–58. Petitioner fails to establish a violation of his constitutional rights.

Lastly, even if the trial court erred in some fashion, such error was harmless. For purposes of federal habeas review, a constitutional error that implicates trial procedures is considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also Fry v. Pliler*, 551 U.S. 112, 117–118 (2007)

(confirming that the *Brecht* standard applies in "virtually all" habeas cases); *Ruelas v. Wolfenbarger*, 580 F.3d 403, 411 (6th Cir. 2009) (ruling that *Brecht* is "always the test" in the Sixth Circuit). In this case, Wilson-Strat's testimony, the text messages between the parties, the evidence confirming the break-in at the Sears' home while Jessica was present, and Sergeant Glass's testimony provided significant evidence of Petitioner's guilt. The trial court's ruling did not have a substantial or injurious effect on the jury's verdict. Habeas relief is not warranted on this claim.

## V. Conclusion

For the reasons stated, the Court concludes that Petitioner is not entitled to federal habeas relief on his claims. Accordingly, the Court **DENIES** and **DISMISSES WITH PREJUDICE** the petition for a writ of habeas corpus.

Before Petitioner may appeal the Court's decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); FED. R. APP. P. 22(b). A certificate of appealability may issue only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a federal court denies relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the constitutional claim debatable or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484–85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). When a court denies relief on procedural grounds without addressing the merits, a certificate of appealability should issue if it is shown that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the court was correct in its procedural ruling. *Slack*, 529 U.S. at 484–85. Petitioner makes no such showing. Accordingly, the Court **DENIES** a certificate of appealability.

Lastly, the Court **DENIES** Petitioner leave to proceed *in forma pauperis* on appeal as an appeal from the Court's decision cannot be taken in good faith. *See* FED. R. APP. P. 24(a).

**SO ORDERED.**

| | |
|---|---|
| Dated: August 30, 2018 | s/Terrence G. Berg<br>TERRENCE G. BERG<br>UNITED STATES DISTRICT JUDGE |

**Certificate of Service**

I hereby certify that this Opinion and Order was electronically filed, and the parties and/or counsel of record were served on August 30, 2018.

s/ H. Monda acting in the absence of A. Chubb
Case Manager
